1  Mark J. Werksman, Esq. (State Bar No. 120767)
   Kelly C. Quinn, Esq. (State Bar No. 197697)
2  Elizabeth Little, Esq. (State Bar No. 307944)
   WERKSMAN JACKSON & QUINN LLP
3  888 West Sixth Street, Fourth Floor
   Los Angeles, California 90017
4  Telephone: (213) 688-0460
   Facsimile: (213) 624-1942
5  Email: mwerksman@werksmanjackson.com

6  Attorneys for Defendant
   Vasken Kenneth Gourdikian
7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11 UNITED STATES OF AMERICA,        )  CASE NO.   CR 18-104-SVW
                                    )
12           Plaintiff,             )  **DEFENDANT VASKEN KENNETH**
        v.                          )  **GOURDIKIAN'S SENTENCING**
13                                  )  **MEMORANDUM**
   VASKEN KENNETH GOURDIKIAN,       )
14                                  )
             Defendant.             )
15                                  )
                                    )
16                                  )
                                    )
17                                  )
                                    )
18 ─────────────────────────────────)

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**PAGE(S)**

I.    INTRODUCTION ........................................................................ 3

II.   STATEMENT OF FACTS ........................................................... 4

    A.    FACTS RELATING TO MR. GOURDIKIAN .................................. 4

        1.    MR. GOURDIKIAN'S EARLY LIFE........................................ 4

        2.    MR. GOURDIKIAN'S EDUCATION AND EMPLOYMENT HISTORY ............................................. 4

        3.    MR. GOURDIKIAN'S FAMILY LIFE..................................... 6

        4.    MR. GOURDIKIAN'S LONG HISTORY OF CIVIC ENGAGEMENT AND COMMITMENT TO HIS COMMUNITY ...................................................................... 8

        5.    MR. GOURDIKIAN'S ADDICTION TO AMASSING A GUN COLLECTION FUELED HIS NEED TO ENGAGE IN THE BUSINESS OF SELLING FIREARMS .... 9

    B.    FACTS OF THE INSTANT CASE ................................................ 10

III.  SENTENCE CALCULATION..................................................... 10

    A.    THE NATURE AND THE CIRCUMSTANCES OF THE OFFENSE AND THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT WARRANT A LESSER SENTENCE ....... 11

        1.    THE HISTORY AND CHARACTERISTICS OF MR. GOURDIKIAN WARRANT A LESSER SENTENCE .......... 11

        2.    THE NATURE AND CIRCUMSTANCES OF THE OFFENSE.............................................................................. 14

            a.    THE NATURE AND CIRCUMSTANCES OF COUNT ONE................................................................. 14

                i.    REQUIREMENTS TO SELL OR PURCHASE A FIREARM.................................... 15

                ii.    REQUIREMENTS TO OBTAIN A LICENSE TO SELL FIREARMS...................... 18

                iii.    CALIFORNIA'S FIREARM ROSTER ............. 19

        3.    THE NATURE AND CIRCUMSTANCES OF COUNT THREE ............................................................................... 23

    B.    SECTION 3553(A) FACTORS CONCERNING THE NEED FOR THE SENTENCE IMPOSED........................................... 25

        1.    THE SERIOUSNESS OF THE OFFENSE ............................. 25

2.      THE NEED TO PROVIDE JUST PUNISHMENT AND PROMOTE RESPECT FOR THE LAW ........................ 26

3.      THE NEED TO PROTECT THE PUBLIC ............................. 26

4.      THERE IS A LOW LIKELIHOOD OF RECIDIVISM .......... 27

C.     KINDS OF SENTENCES AVAILABLE ........................................... 29

IV.   CONCLUSION .............................................................................................. 30

# TABLE OF AUTHORITIES

**PAGE(S)**

## SUPREME COURT CASES

*Abramski v. United States*
   573 U.S. 169 (2014)........................................................................ 23

*Gall v. United States*
   552 U.S. 38, 49 (2007)........................................................ 10,11,12,14

*Kimbrough v. United States*
   552 U.S. 85, 101 (2007)................................................................... 10

*United States v. Knights*
   534 U.S. 112, 119 (2001)................................................................. 29

## FEDERAL CASES

*Pena v. Lindley*
   898 F.3d 969 (9th Cir. 2018) ........................................................... 19

*Simon v. United States*
   361 F. Supp. 2d 35, 43 (E.D.N.Y. 2005) ........................................ 26

*United States v. Adelson*
   441 F. Supp. 2d 506 (S.D.N.Y. 2006) ............................................ 11

*United States v. Cooper*
   394 F.3d 172 (3d Cir. 2005).............................................................. 12

*United States v. Jones*
   158 F.3d 492, 500-01 (10th Cir. 1998) ............................................ 12

*United States v. Peppel*
   707 F.3d 627, 637-638 (6th Cir. 2013) ............................................ 11

*United States v. Rodriguez*
   527 F.3d 221, 228 (1st Cir. 2008)..................................................... 11

*United States v. Schroeder*
   536 F.3d 746, 756 (7th Cir. 2008) ................................................... 12

*United States v. Serafini*
   223 F.3d 758, 773-74 (3d Cir. 2000) ................................................ 12

*United States v. Spigner*
   416 F.3d 708, 711 (8th Cir. 2005) ................................................... 25

*United States v. Thurston*
   358 F.3d 51, 78 (1st Cir. 2004)......................................................... 12

*United States v. Wilson*
   350 F. Supp. 2d 910 (D. Utah 2005)................................................ 26

PAGE(S)

**FEDERAL STATUTES**

18 U.S.C. § 921 ................................................................................................ 19

18 U.S.C. § 922 .................................................................................... 3,14, 23

18 U.S.C. § 923 ................................................................................................ 19

18 U.S.C. § 3551 .............................................................................................. 28

18 U.S.C. § 3553 ........................................................................................ passim

18 U.S.C. § 3582 .............................................................................................. 29

18 U.S.C. § 5861 ................................................................................................ 3

Mark J. Werksman, Esq. (State Bar No. 120767)
Kelly C. Quinn, Esq. (State Bar No. 197697)
Elizabeth Little, Esq. (State Bar No. 307944)
WERKSMAN JACKSON & QUINN LLP
888 West Sixth Street, Fourth Floor
Los Angeles, California 90017
Telephone: (213) 688-0460
Facsimile: (213) 624-1942
Email: mwerksman@werksmanjackson.com

Attorneys for Defendant
Vasken Kenneth Gourdikian

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.   CR 18-104-SVW |
| Plaintiff, | **DEFENDANT VASKEN KENNETH GOURDIKIAN'S SENTENCING MEMORANDUM** |
| v. | |
| VASKEN KENNETH GOURDIKIAN, | |
| Defendant. | |

**TO THE HONORABLE STEPHEN V. WILSON, UNITED STATES DISTRICT JUDGE, AND TO ASSISTANT UNITED STATES ATTORNEY ELIZA FERNANDEZ:**

Defendant, Vasken Kenneth Gourdikian, by and through his counsel of record, WERKSMAN JACKSON & QUINN LLP, hereby files Defendant Vasken Kenneth Gourdikian's Sentencing Memorandum.

/ / /

/ / /

/ / /

/ / /

/ / /

1

DATED: January 18, 2019

Respectfully submitted,
WERKSMAN JACKSON & QUINN LLP

Mark J. Werksman
Kelly C. Quinn
Elizabeth S. Little
Attorneys for Defendant
Vasken Kenneth Gourdikian

2

# I.
# INTRODUCTION

On September 20, 2018, Mr. Gourdikian pled guilty to Engaging in the Business of Dealing in Firearms without a License in violation of 18 U.S.C. § 922(a)(1)(A) (Count One); and Making a False Statement During the Purchase of Firearm in violation of 18 U.S.C. § 922(a)(6) (Count Three).[1]

Pursuant to a written plea agreement, the parties agreed to a base offense level of 12 (U.S.S.G. §2K2.1(a)(7)); an eight-level increase for the number of firearms pursuant to §2K2.1(b)(1)(D); and a two-level increase for abusing a position of trust (§3B1.3). The government also agreed to recommend up to a three-level reduction for acceptance of responsibility and to recommend a sentence of 30 months custody. The parties reserved the right to seek additional specific offense characteristics, adjustments, departures, and variances.

On December 27, 2018, Probation filed its PSR. The Probation Officer's findings and recommendations comport with the parties' agreement, resulting in a total offense level of 19. (PSR ¶¶34-46.) Probation calculates a total criminal history score of zero, placing Mr. Gourdikian in the criminal history category of I, with a resulting guidelines range of 30 to 37 months. (PSR ¶81.) Probation recommended a low-end sentence of 30 months, followed by a one-year term of supervised release. (Doc. 29 at 2.) As set forth herein, given a consideration of the mitigating factors enumerated in 18 U.S.C. § 3553(a), Mr. Gourdikian requests a sentence well-below the Guideline range.

---

[1] In exchange for his plea, Counts Two and Four of the Four-Count Indictment were dismissed. Count Two charged Mr. Gourdikian with Making a False Statement During Purchase of a Firearm in violation of 18 U.S.C. § 922(a)(6). Count Four charged Mr. Gourdikian with Possession of an Unregistered Firearm in violation of 18 U.S.C. § 5861(d).

## II.
## STATEMENT OF FACTS

### A.   FACTS RELATING TO MR. GOURDIKIAN

#### 1.   MR. GOURDIKIAN'S EARLY LIFE

Mr. Gourdikian was born to Seta and Ardashes Gourdikian on January 18, 1970 in Pasadena, California. His parents were ethnic Armenians who emigrated to the United States from Lebanon in search of a better life. He was raised in a middle-class neighborhood in Pasadena, where many of his extended family members also resided. As a first-generation American, Mr. Gourdikian understood the value of growing up in the United States and was often reminded of the great hardships his parents and grandparents faced. His parents were "proud Americans" with successful careers—his father worked as a chemist, and his mother was a bilingual teacher.

#### 2.   MR. GOURDIKIAN'S EDUCATION AND EMPLOYMENT HISTORY

Mr. Gourdikian graduated from John Muir High School in 1988 and spent four years at Pasadena City College. Although his parents wanted him to continue his academic pursuits, he chose to leave college and follow his passion to serve his local community as a police officer.[2] (Exhibit A, Letter from Berj Beramian.) He was hired by the Pasadena Police Department in 1994, where he served diligently for more than twenty years. (PSR ¶73.) Mr. Gourdikian "quickly excelled as a police officer, and within no time [was] deservedly promot[ed] through the ranks." (Exhibit B, Letter from Randell K. Taylor.) He worked as a Field Training Officer, Vice Narcotics Specialist, SWAT Team Leader, Homicide Detective, Detective

---

[2] Mr. Gourdikian later obtained his bachelor's degree in criminal justice from the University of Phoenix in 2001 while he was working full time. He also obtained his master's degree in public administration from California State University Northridge.

4

and Community Relations Officer, and Sergeant. As his former supervisor, Randell K. Taylor, writes:

> As a sergeant, Vasken displayed great leadership skills, the ability to teach, nurture, hold accountable, discipline and accomplish goals came easy for him. Growing up in the city which he worked was a true benefit for both he and the organization. As a sergeant Vasken had an immediate impact on how the city was policed and interacted with its community members. Vasken embodied the tenants of the police department's credo . . . putting the department's and [t]he city's goals first.

(Exhibit B.)

Mr. Gourdikian was held in the highest esteem and regard by his fellow officers, subordinates, and supervisors. And, in 2013, was promoted to lieutenant. Significantly, even after he was promoted to one of the highest executive positions in his department, he continued to serve as a mentor to the youth in his community. Thus, he was not just mentoring youth to gain leverage in the promotion process as many young officers do; he genuinely cared for the community he served. (See Exhibit C, Letter from Sergeant Michael Gligorijevic.)

Mr. Gourdikian spent his entire adult life working to protect and serve the citizens of Pasadena. (See Exhibit D, Letter from Alan B. Snitzer.) Indeed, his career on the force meant everything to him. As his wife, Roubina Gourdikian, laments:

> Vasken . . . sacrificed his family time, holidays, special occasions, and his own vacation to help others. . . . I was always surprised [at] how he can function so well with such little sleep but it was his passion for the job that kept him going. He was definitely the 'go to' person in the department, and, to my disapproval at times, did not use a single sick day off in 24 years.

(Exhibit E, Letter from Roubina Gourdikian.)

Because of the instant case, Mr. Gourdikian lost the career and professional reputation it took him decades to build. He resigned from the Pasadena Police

Department in good standing in March 2018, with the understanding that a felony conviction would be a basis for termination. As his former colleague Christopher Gutierrez explains: "[T]he day of his exit interview from the Pasadena Police Department he personally went around the department and spoke to people, when I met with him he was truly ashamed and made a very humbling statement. He said that he would give anything in the world just to be back in uniform as a regular police officer." (Exhibit F, Letter from Chris Gutierrez.) Mr. Gourdikian has now received notice from the California Public Employees' Retirement System (CalPERS) that because his crimes date back to 2014, his pension eligibility will be rolled back five years, and he will not receive credit for his highest paying period of service. Thus, Mr. Gourdikian is also losing hundreds of thousands of dollars of pension benefits over his lifetime.

Although devastated by the loss of his decades-long career with the Pasadena Police Department, Mr. Gourdikian was determined to find work to support his family and put his children through college. In July 2018, Mr. Gourdikian was hired by Westport Construction, Inc. to work as a project manager. As his employer, George Cummings writes, "[Vasken] was able to adapt to an entirely new career without much difficulty. [He] is an integral part of our organization and I rely on him heavily to accomplish our goals." (Exhibit G, Letter from George Cummings.) Any significant period of incarceration would result in his termination from the company.

### 3.    MR. GOURDIKIAN'S FAMILY LIFE

Mr. Gourdikian married his high-school sweetheart, Roubina Gourdikian, on May 11, 1996. Together, they have two children: A.S. Gourdikian (age 19); and A.A. Gourdikian (age 17). Mr. Gourdikian is the epitome of a family man; he is extremely devoted to his wife and children. (See Exhibit H, Letter from Jordan C. Hayes.) As his many friends and family members attest:

6

> Vasken is a faithful husband with a strong marriage to his amazing wife. They have raised two exceptional sons, who are polite, respectful, good students with bright futures ahead of them. I know Vasken's influence and example played a huge role instilling these values in them.

(See, e.g., Exhibit I, Letter from Robert Gaudet.) Mr. Gourdikian' s elder son is a pre-med college student, and his younger son is a gifted musician who is currently a senior in high school.

With his children moving out of the house to attend college, Mr. Gourdikian will need to be home to help care for his wife. Five years ago, Mrs. Gourdikian was diagnosed with Graves disease, which has deeply affected her immune system and eye sight. (See Exhibit E.) As his wife explains, "My husband has stood by me through my roller coaster of emotions and has been a pillar of support in order for me to be in remission of this horrible disease. My endocrinologist has emphasized that my life be stress free in order to be in complete remission. . . . I will need [my husband] to continue to support me as I deal with orbital decompression surgery for my eyes." (Exhibit E.)

In spite of the unfortunate circumstances he now finds himself in, Mr. Gourdikian has used his mistakes as a teaching opportunity for his children. As his friend, Mike Burke, explains:

> I know no father who surpasses the consistency that Vasken demonstrates in raising his two sons. I've seen them grow from small boys to men, and they share the moral character that I know their father has. . . . Perhaps the most difficult result of this situation for Vasken has been on the impact his actions have had on that code of character has taught them throughout their lives. I know he faced things transparently with them—and used the situation as a means to further teach them.

(Exhibit J, Letter from Mike Burke.)

/ / /

/ / /

/ / /

7

### 4.   MR. GOURDIKIAN'S LONG HISTORY OF CIVIC ENGAGEMENT AND COMMITMENT TO HIS COMMUNITY

As a first-generation American, Mr. Gourdikian has a deep appreciation for the opportunities this country provides. For that reason, Mr. Gourdikian is deeply involved in the community, and has demonstrated a commitment to civic engagement and charitable work. (*See*, *e.g.*, Exhibit K, Letter from Eugene J. Egan; Exhibit L, Letter from Mark B. Goodman; Exhibit M, Letter from Talin V. Yacoubian, AGBU Western District Chair; Exhibit N, Letter from Seta Ghazarian, Founder of the Armenian Lighthouse Charitable Foundation; Exhibit O, Police Commander Ed Calatayud, III.)

In addition to serving his community as a police officer for twenty-four years, Mr. Gourdikian has also volunteered his time with numerous charitable organizations. Most notably, Mr. Gourdikian served as a Board Member for the Armenian General Benevolent Union (AGBU), where he personally took management of AGBU's GenerationNext program—a program established to assist at-risk youth. (Exhibit M.) He also oversaw the Pasadena Police Activities League (PAL), which is an afterschool program dedicated to help youth in the Pasadena community. As his colleague Jill Hawkins writes: "[Lt. Vasken Gourdikian] was very dedicated to the program and the youth of the Pasadena community. He was instrumental in helping the board raise funds for the program and creating new and unique opportunities for the kids." (Exhibit P, Letter from Jill Hawkins.) Mr. Gourdikian remains close with one of the children he mentored. As his wife attests:

> He was asked to mentor a 13 year-old [sic] at-risk youth through the Pasadena Police Police Department which Vasken lovingly accepted. Joseph did not have any parents and did not have the guidance to make the right decisions in his life and school. Vasken stood by him for eight years through Joseph's trials and tribulations and made sure he was placed in a loving home and the right high school. One of our fondest

memories was to be present at Joseph's high school graduation. Joseph continues to be part of our life and has a solid job with a security firm. (Exhibit E.)

Mr. Gourdikian also held a board position on the Armenian American Middle East Club for several years, a non-profit that sponsors activities that bring Armenian family members together and other non-profits in the area. (Exhibit Q, Letter from Maral Pigeon.) He also served as the chief liaison between the Pasadena Police Department and the Pasadena Armenian Police Advisory Council (PAPAC) for more than fifteen years. (Exhibit R, Letter from Dikran Davidian, President of PAPAC.) The PAPAC is a non-profit that seeks to bring about a constructive relationship between the police and Armenian Community. As evidenced by the numerous support letters submitted on his behalf, Mr. Gourdikian is a pillar of the community who has committed himself to serving others his entire life.

### 5.   MR. GOURDIKIAN'S ADDICTION TO AMASSING A GUN COLLECTION FUELED HIS NEED TO ENGAGE IN THE BUSINESS OF SELLING FIREARMS

Mr. Gourdikian has pleaded guilty and does not dispute that he was engaged in the business of selling firearms without a license. However, he got to the point where he was engaging in firearm transfers for profit after an escalating addiction to the collection of firearms. As his wife explains:

> Around three years ago, I noticed by husband had started to collect guns as a hobby[.] Within a year, I noticed that my husband's passions for guns had become an obsession. He got so much joy from buying new guns and adding to his vast collection which I never understood. Although I objected to his obsessive hobby many times, I noticed it was his outlet for day-to-day stress, He was working almost seven days a week and this hobby was a form of relaxation for him.

(See Exhibit E.) Indeed, over the course of three years, Mr. Gourdikian went from owning three guns to amassing a significant collection of firearms. Even as his

9

wife's disapproval grew, his need to engage in this behavior remained unchanged, and he became more secretive about his conduct, often spending hours at a time furtively browsing firearm websites. At some point, to keep his wife from knowing how much money he was spending, he began to engage in the business of selling firearms and used that money to purchase more firearms. Mr. Gourdikian now recognizes how compulsive his behavior was and the need to find more constructive ways to deal with stress management.

## B.     FACTS OF THE INSTANT OFFENSE

The facts of the instant offense are set forth in the stipulated factual basis of the Plea Agreement and are incorporated herein by reference. Additional contextual facts are set forth in Section III.A.2. *infra* to assist this Court in evaluating the nature and circumstances of the offense under 18 U.S.C. § 3553(a)(1).

## III.
## SENTENCE CALCULATION

The "over-arching provision" of 18 U.S.C. § 3553(a) is that the Court impose a sentence that is "sufficient, but not greater than necessary" to achieve the goals of sentencing. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). Under section 3553(a), the factors the Court should consider in making this determination include: 1) the nature and the circumstances of the offense and the history and characteristics of the defendant; 2) the purposes of sentencing; 3) the kind of sentences available; 4) the United States Sentencing Guideline calculation; 5) pertinent policy statements; 6) the need to avoid unwarranted sentence disparities; and 7) the need to provide restitution. 18 U.S.C. § 3553(a). While the Guideline Sentencing Range ("GSR") is a "starting point and the initial benchmark," the Guidelines are not the sole, nor even the first among the factors that Congress has commanded the court to apply pursuant to section 3553(a). *See Gall v. United*

*States*, 552 U.S. 38, 49 (2007). Instead, in reaching a decision on what constitutes an appropriate sentence, the district court should "consider all the relevant factors" and "construct a sentence that is *minimally sufficient* to achieve the broad goals of sentencing." *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008) (emphasis added).

As set forth herein, all § 3553(a) factors, considered together, warrant a sentence substantially less than the thirty months recommended by Probation.

## A.   THE NATURE AND THE CIRCUMSTANCES OF THE OFFENSE AND THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT WARRANT A LESSER SENTENCE

The first consideration under 18 U.S.C. § 3553(a) is the nature and circumstances of the offense and the history and characteristics of the defendant. As set forth herein, this factor militates toward a lesser sentence.

### 1.   THE HISTORY AND CHARACTERISTICS OF MR. GOURDIKIAN WARRANT A LESSER SENTENCE

18 U.S.C. § 3553(a)(1) is a "broad command to consider" the history of the defendant. *Gall v. United States*, 552 U.S. 38, 50 n, 6 (2007). As one court has noted, "Surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant." *United States v. Adelson,* 441 F. Supp. 2d 506 (S.D.N.Y. 2006).[3]

---

[3] Rejected on other grounds by *United States v. Peppel*, 707 F.3d 627, 637-638 (6th Cir. 2013).

One important consideration to take into account with respect to Gourdikian's history and characteristics is his engagement in exceptional charitable and civic activities, or "good works." *See United States v. Cooper*, 394 F.3d 172 (3d Cir. 2005) (citing *United States v. Thurston*, 358 F.3d 51, 78 (1st Cir. 2004)). Indeed, "[w]hether good works qualify as exceptional is evaluated with reference to the offender's wealth and status in life"; in essence, more is expected of an exceedingly wealthy person that just donating a large sum of money. *Id.*; *see, e.g.*, *United States v. Serafini*, 223 F.3d 758, 773-74 (3d Cir. 2000) (finding three-level downward departure justified where defendant provided a $300,000 guarantee for medical treatment of a terminally ill patient and mentored a seriously injured college student showing generosity of time and money); *United States v. Jones*, 158 F.3d 492, 500-01 (10th Cir. 1998) (finding three-level downward departure warranted considering, *inter alia*, defendant's long history of community service).

Another relevant consideration under this factor is the impact incarceration would have on innocent family members. *See United States v. Schroeder*, 536 F.3d 746, 756 (7th Cir. 2008). In *Gall v. United States*, 552 U.S. 38, 47 (2007), the Supreme Court upheld a probationary sentence in a drug case and found that a court does not need to find "extraordinary circumstances" to find that a variance is warranted under one of the § 3553(a) factors, such as the impact of incarceration on family members. Instead, the court "must make an individualized assessment based on the facts presented." Id. at 39.

In the instant case, the history and characteristics of Mr. Gourdikian militate towards a lesser sentence. Mr. Gourdikian has no criminal history, and the numerous support letters from the people who know him confirm that the charge against him is entirely inconsistent with his past behavior and overall character. As his friend, Jordan Hayes, writes:

12

> I know that Vasken is an extremely high-caliber individual. He demonstrated poor judgment, but this is not who Vasken Gourdikian is. In fact, for those of us who know him like I do, we think of him as the exact opposite of this ordeal: as someone who is ethical and uses sound judgment [sic] for the benefit of others.

(Exhibit H.)

Additionally, as discussed in detail above, Mr. Gourdikian has clearly engaged in exceptional charitable and civic engagement throughout his lifetime. Mr. Gourdikian's primary focus was helping at-risk children in the Pasadena community. As Suzanna Sargsyan, employee of the non-profit organization AGBU writes:

> During his tenure on [AGBU's Western District Committee], Mr. Gourdikian dedicated a lot of his time to one of the longstanding programs, the Generation Next Mentorship Program[.] He took the lead on coaching the Program Director and helped revitalize and revamp the program to successfully expand its reach. With his experience in the Pasadena Police Activities League[.] It is unmistakable to all that Mr. Gourdikian poured his life into his career and deeply enjoyed public service.

(Exhibit S, Letter from Suzanna Sargsyan.)

Moreover, even after his arrest for the instant offense, Mr. Gourdikian continues to help others. As his friend, Donald Amerman explains:

> Vasken was there for me . . . when I was diagnosed with tongue and lymph node cancer last April. I was already going through a nasty divorce and sure didn't need to have dealt with this illness at the same time. Even while dealing with his own issues he made certain that if I needed a ride to treatments he took me and went out of his way to do so. Towards the end of my treatments I needed someone to look after me as I could not trust myself to drive after my second Chemo treatment I was too sick.

(Exhibit T, Letter from Donald Amerman.)

Finally, Mr. Gourdikian's wife was diagnosed with Graves disease five years ago, resulting in serious damage to her immune system and eyesight. (See

Exhibit E.) As a result, she will need to undergo orbital decompression surgery for her eyes. With their children away in college, Mr. Gourdikian will need to be home to care for his wife. As a result, any period of incarceration would be devastating for his wife.

In sum, the instant offense is entirely inconsistent with Mr. Gourdikian's overall character, and through his charitable works, civic engagement, and generous spirit, Gourdikian's talents are better utilized out of custody.

## 2.  THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

18 U.S.C. § 3553(a)(1) also gives the sentencing court a "broad command" to consider the nature and specific circumstances of the offense. *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007). The factual statements in the Plea and the PSR set forth numerous facts which detail Mr. Gourdikian's conduct. As set forth herein, the nature and circumstances of the instant offense are mitigating and warrant a lesser sentence.

### a.  THE NATURE AND CIRCUMSTANCES OF COUNT ONE

Mr. Gourdikian pleaded guilty in Count One to Engaging in the Business of Dealing in Firearms Without a License, in violation of 18 U.S.C. § 922 (a)(1)(A). In short, the cited subdivision of § 922 is a licensing statute which requires a person to obtain a Federal Firearms License ("FFL") when "engaged in the business" of selling firearms. In addressing why Mr. Gourdikian needed to have an FFL, the factual allegations in the plea agreement and PSR detail several firearm transactions. These facts are necessary to the finding that Mr. Gourdikian was "engaged in the business" of selling firearms, discussed *infra*. By necessity, the factual statements in the Plea and PSR include a significant discussion of the requirements under both state and federal law to purchase and sell a firearm, and use some technical terms employed only in California firearms law. To avoid any

14

confusion concerning the import of these facts and terms, the defense will set forth a short explanation of the federal and state requirements to assist this Court in assessing what the crime listed in Count One is (dealing without a license), and, equally as important, what it is not (improperly selling firearm or selling to prohibited person).

### i.  REQUIREMENTS TO SELL OR PURCHASE A FIREARM

Purchasing a firearm in California requires a multi-step process, which is significantly more detailed than the process required under federal law, or almost any other state. To lawfully obtain a firearm in California, a purchaser must go through a dealer who has an FFL and a California firearms dealer's license.[4] When neither party to the transaction is a licensed dealer, the transaction must be conducted through an FFL. Under federal law, a buyer must fill out a Form 4473, which requires identifying information of the purchaser (name, birth date, etc.). California additionally requires that the dealer fill out a Dealer's Record of Sale ("DROS"). This form separately requires information about the purchaser, the firearm, and the transaction type (dealer sale, private party transaction, etc.). After filling out the information on a DROS, California also requires that the FFL obtain a thumbprint from the purchaser. *See* Cal. Penal Code § 28215(c).

The information collected from the federal and state forms is then used by the government to conduct a check of the purchaser's background and eligibility to possess, own, and receive firearms. 27 C.F.R. § 478.124; Cal. Penal Code section

_____

[4] Many of the state and federal firearm laws and regulations, including those regulating purchases from an FFL, have exceptions; for example, under California law, there is an exception to the FFL requirement where, *inter alia*, the transfer is effectuated through an intrafamilial transfer. The list of these exceptions is often very lengthy, much lengthier than the statute itself. In the interest of brevity, unless relevant to the facts of the instant case, the exceptions to the cited firearm laws and regulations will not be listed.

28215. Under California law, while the background check is being conducted, a purchaser must wait ten days before receiving the firearm from the FFL. Cal. Penal Code § 26815(a). The firearm will not be transferred to the purchaser unless he/she has cleared the background check and the waiting period has passed. *Id.*

California additionally requires that all firearm purchasers pass a written firearms safety test administered by a DOJ Certified Instructor and show proof of the Firearm Safety Certificate ("FSC") to the FFL. Cal. Penal Code § 31640. Moreover, anyone acquiring a firearm from an FFL in California must perform a safe-handling demonstration in front of a DOJ Certified Instructor before receiving the firearm. Cal. Penal Code §§ 26850, 26860. Both federal and state law require that the purchaser present proof of identity and age before the firearm can be released. 18 U.S.C. §§ 922(t)(1)(C), 1028(d)(3); 27 C.F.R. §§ 478.11, 478.124(c)(3)(i); Cal. Penal Code §§ 26815(c), 27540(c).

Federal law has no registration requirement on unregulated firearms; however, since 2014, all firearms purchased in California from an FFL are registered to the purchaser. The California Department of Justice receives information about the purchase and firearms, and that information is recorded in the Automated Firearms System ("AFS") before the firearm is released. Cal. Penal Code §§ 28155, 28160, 28215(d). Thus, California maintains a centralized database of all firearm transactions conducted by an FFL anywhere in the state.

In the instant case, a significant number of the transactions noted in the Plea and PSR were conducted via private party transfers ("PPT"). In many states and under federal law, private party sellers are not required to use an FFL, to verify that the buyer is not a prohibited person, or even to inspect a buyer's driver's license or any other identification. These private party transaction "loopholes" have long

1  been lamented as a chief concern with the current firearms regulations.[5]

2      However, California is a rare exception where the laws for a private party

3  transaction are actually stricter than when a purchaser buys directly from an FFL.[6]

4  In California, every private party transaction must go through an FFL, utilizing the

5  procedure noted above. The law additionally requires that for a PPT, the DROS

6  form must contain detailed information from the seller as well as the purchaser.

7  *See* Cal. Penal Code § 28060(c). Furthermore, the seller (not just the buyer) must

8  show proof of residency in California and the firearm must have a locking device

9  when the FFL delivers it to the purchaser. Thus, unlike in most jurisdictions, using

10  a private party transfer in California is not a way to get around firearm purchasing

11  or registering requirements.

12      The factual basis in the Plea and PSR shows that Mr. Gourdikian engaged in

13  a number of private party transactions. To be clear, for each transaction, Mr.

14  Gourdikian was going through the entire process required to purchase and sell

15  firearms in California. He was, *inter alia*, using an FFL for every transfer,

16  complying with the state and federal recording requirements, and ensuring that he

17  was not selling to any prohibited persons. Thus, while Mr. Gourdikian has pled

18  guilty to "engaging in the business" of selling firearms, as discussed below, this is

19  not a case where a defendant was selling firearms out of the truck of his car to

20

21

22

---

23  [5] "The private-party gun market," one study observed, "has long been recognized

24  as a leading source of guns used in crimes" because sellers are not going through

     the background process. *See* Garen J. Wintemute, Anthony A. Braga, & David M.

25  Kennedy, *Private–party Gun Sales, Regulation, and Public Safety*, 6 New England

26  Journal of Medicine 363, 508–511 (2010).

27  [6] One advantage to Private Party transactions under California law is that they are

28  exempt from the "one handgun per month" limitation. Cal. Penal Code § 27535(b).

anyone off the street.[7] The conviction under Count One is not because those individual acts of selling the firearms were unlawful under federal law, they were not; instead, the allegation in Count One was that Mr. Gourdikian conducted a sufficient enough number of those transactions, so that he was considered "engaged in the business," requiring him to have a license.

### ii.     REQUIREMENTS TO OBTAIN A LICENSE TO SELL FIREARMS

Both federal and California law allow a private party to sell firearms in the manner described above. However, if a person sells enough firearms to be "engaged in the business" of selling firearms, then, under federal law, he/she needs to get a license. The Code of Federal Regulations defines a person "engaged in the business" as:

> [A] person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a person collection or for a hobby, or who sells all or

---

[7] The factual basis discusses, *inter alia*, the sale of a shotgun to an undercover ATF agent, stating that Mr. Gourdikian advertised a shotgun for sale, and noting that "[t]he next day, at All State Police Equipment Company located in Pomona, California, defendant sold a Mossberg model SPX 12-gauge shotgun . . . to a customer who was, in fact, an ATF agent working in an undercover capacity, in exchange for $700 in case." (PSR ¶24.) This is certainly a correct statement of the facts. However, to be clear, the parties to the transaction (Mr. Gourdikian and the ATF agent) did not conduct a straight exchange of firearm for cash. Instead, the parties met at an FFL; the undercover agent gave Mr. Gourdikian $700, paid $25 to obtain a firearm safety card, and paid $35 to the FFL to conduct a private party transaction. Both the undercover agent and Mr. Gourdikian supplied the necessary documents to the employee at the gun shop, including the ATF Form 4473. The firearm remained at the FFL location while the State of California conducted the background check.

part of his personal collection of firearms.

18 U.S.C. § 921(a)(21)(C). To be clear, under federal law, a person can sell intrastate to non-prohibited persons with no limit; however, if the seller is making those same transactions "with the principal objective of livelihood and profit," then he or she does need a permit. Here, the conviction under Count One was based on the fact that Mr. Gourdikian engaged in the "business" of selling firearms without a license because he was selling firearms "with the principal objective of livelihood and profit." *Id.*

For context, Mr. Gourdikian could have easily obtained such a license. He only needed to complete an application (ATF Form 7); pay a fee (the fees range from $30-200 depending on the type of license); and establish premises from which to conduct "business;" the premises need not be a storefront and is oftentimes a home. *See* 18 U.S.C. §§ 923(a), 923(a)(3)(B), 923(d)(1)(E)(i), 923(d)(1)(F)(i)–(ii). This process would have taken him minutes to complete and would not have been a significant expense. However, he clearly failed to do so, in violation of federal licensing law. As such, Mr. Gourdikian has pleaded guilty to this Count, and understands the error he made in not acquiring an FFL.

### iii.   CALIFORNIA'S FIREARM ROSTER

Several references in the factual basis refer to "off-Roster" firearms. This term has no meaning in federal law but is a much-litigated part of the California firearm law landscape.[8] Because it is referenced so often in this case, the defense will herein provide a brief description of what "off-Roster" firearms are—and what

---

[8] As Justice Bybee of the Ninth Circuit recently stated when attempting to decipher the practical effect of California's requirements for admittance on the Roster: "[i]f all this feels complicated and backwards, welcome to the strange world" of analyzing firearm laws. *Pena v. Lindley*, 898 F.3d 969 (9th Cir. 2018) (Bybee, J., dissenting).

1  they are not.

2      The California Department of Justice maintains a Roster of Handguns

3  Certified for Sale in California.[9] Firearms not listed on the Roster are sometimes

4  referred to as "unsafe handguns." However, that term misstates the practical

5  implications of the Roster as currently constituted. As the Ninth Circuit has

6  recently noted, "[e]ffectively the Act presumes all handguns are unsafe unless the

7  CDOJ determines them 'not to be unsafe.'" *Pena*, 898 F.3d at 973.

8      The Roster was originally intended to stop the sale of "Saturday night

9  specials," and required that a handgun sold in California meet certain safety, firing,

10  and drop safety requirements. *See* Cal. Penal Code § 31910; see also Cal. Penal

11  Code §§ 31905, 31900, 32010. In order to determine if a firearm meets

12  California's criterion, firearm manufacturers must have their firearms tested and

13  pay a fee to the state of California; manufacturers must also pay an annual fee to

14  remain on the Roster. *See* Cal. Penal Code § 32015. If a manufacturer does not pay

15  the requisite fee, or pay California every year, their firearm is deemed "unsafe" by

16  the State of California. The Ninth Circuit has recently recognized that "handguns

17  might not be on the roster for the simple reason that they have not been submitted

18  to DOJ for testing for reasons wholly unrelated to the [requirements]. And,

19  handguns could have fallen off the list simply because no one paid the fee to keep

20  them on." *Pena*, 898 F.3d at 973. Indeed, almost half of the firearms on the list in

21  2013 (meaning they passed the safety requirements as then constituted) have since

22  "fallen off" the list because manufacturers no longer wish to pay for or participate

23  in the list. *See id.* at 978 n.9.

24      "[O]ver time, California has added new requirements for inclusion on the

25  roster," including in 2013, a "first of its kind" law which added the additional

26

27  [9] *See* Roster of handguns Certified for Sale, California Dept. of Justice, Bureau of

28  Firearms, http://certguns.doj.ca.gov/.

20

requirement for semi-automatic pistols that they be equipped with microstamping technology.[10] *Id.* at 974, 984. However, no manufacturer has yet been able to meet this standard. *See id.* at 983. In *Pena*, Justice Bybee noted:

> Plaintiffs argue that the testing protocol adopted by the California Department of Justice ("CDOJ") in its regulations is so demanding that no gun manufacturer can meet it. Plaintiffs have come forward with evidence that no new handguns being sold in the United States can satisfy CDOJ's testing protocol and, therefore, no new handguns qualify for California's approved-as-safe roster. . . . So far as we can tell from the meager record before us, no one—including CDOJ—has ever tested any weapon against California's protocol to see whether it is technologically feasible.

*Id.* at 988 (Bybee, J., dissenting). Justice Bybee further noted "[t]oday, no one in California can purchase handguns that have the safety features the legislature thought critical for saving lives, nor can any Californian purchase guns with the microstamping feature the legislature thought important to assist police. The only guns commercially sold in California are grandfathered from these provisions. This is a totally perverse result." *Id.* at 989 (Bybee, J., dissenting).

The above information is provided only as context to what the California Roster is, and what firearms can and cannot be placed on that list. Regardless of the practical problems with the California Roster, it is important to be clear that the Roster only (as relevant here) places restrictions on FFL's selling of those firearms. Possession of an "off-Roster" firearm *is not prohibited* under California law. In fact, many people in California lawfully possess these "off-Roster" firearms. Persons possessing these firearms (even those who are not law enforcement) can also lawfully transfer these firearms via an intrafamilial transfer. Additionally,

---

[10] Microstamping is the process of laser-engraving a pistol's make, model, and serial number on parts of the firearm, including its firing pin, so that the information is stamped on the cartridge casing or primer when the pistol is discharged. *See Pena*, 898 F.3d at 974.

while FFL's cannot generally sell non-Roster firearms, California law allows an FFL, *inter alia*, to sell these purportedly "unsafe handguns" to certain individuals to use personally or professionally, including, but not limited to, persons from a district attorney's office, the Department of Justice, and police officers. *See* Cal. Penal Code § 32000(b)(4). Thus, it is completely lawful under California law for any person (generally qualified to possess firearms) to own an off-Roster firearm, and it is lawful for a police officer (or district attorney, etc.) to sell "off-Roster" firearms in a private party transaction—using an FFL, or for a family member possessing an "off-Roster" firearm to do an intrafamilial transfer—without using an FFL.

The Plea and PSR provide that Mr. Gourdikian was selling, through private party transactions, off-Roster firearms using an FFL. This is not part of the actual allegation in Count One but is listed as factual background in the case. When considering the import of these facts to the seriousness of the offense, it is relevant to note that federal law has no comparable Roster, and, that, although these firearms were not on California's Roster, there is no evidence that the firearms themselves—manufactured by respected companies, such as Glock, Sig Sauer, and Colt—were actually unsafe "Saturday night specials." The only allegation is that, for whatever reason, these firearms were not on the California Roster. Furthermore, as noted above, it was lawful for Mr. Gourdikian to have these firearms, and, as a police officer, it was lawful under California law for Mr. Gourdikian to sell the "off-Roster" firearms through an FFL using a private party transfer. The relevance of this information in the instant case is not to show that those individual "off-Roster" transactions themselves violated the law; instead, it shows that (although, again, not a violation of federal law) by lawfully selling several "off-Roster" firearms via a private party transfer, using an FFL, Mr. Gourdikian was "engaged in the business" of selling firearms. It further shows that, as a police officer, Mr. Gourdikian was able to (lawfully) acquire and sell these

firearms in a way which an average citizen could not, an allegation Mr. Gourdikian does not dispute.

### 3.    THE NATURE AND CIRCUMSTANCES OF COUNT THREE

Mr. Gourdikian pleaded guilty to Count Three: False Statement During Purchase of a firearm, in violation of 18 U.S.C. § 922(a)(6). The false statement occurred on federal firearm Form 4473, which asks, *inter alia*, the yes or no question: "[a]re you the actual transferee/buyer of the firearm(s) listed on this form?" It then provides a "Warning" that "you are not the actual transferee/buyer if you are acquiring the firearm(s) on behalf of another person." The notes section on the form explains: "Mr. Smith asks Mr. Jones to purchase a firearm for Mr. Smith[.] Mr. Smith gives Mr. Jones the money for the firearm. Mr. Jones is NOT THE ACTUAL TRANSFEREE/BUYER of the firearms."

In 2014, the United States Supreme Court addressed the purpose of 18 U.S.C. § 922(a)(6) in *Abramski v. United States*, 573 U.S. 169 (2014). In *Abramski*, the Supreme Court considered, *inter alia*, whether a violation of § 922(a)(6) requires that the actual purchaser (the third-party who would ultimately acquire the firearm) has to be a prohibited person who could not have lawfully purchased the firearm. The *Abramski* defendant argued that, because the actual purchaser in that case was not a prohibited person, the misrepresentation on the 4473 Form was not material. *Id.* at 177. The defendant reasoned that "the statute's core purpose—'keeping guns out of the hands' of criminals and other prohibited persons—' is not even implicated." *Id.* at 190. The Supreme Court acknowledged that keeping firearms out of the hands of prohibited persons was one core purpose of § 922. *Id.* However, the Court also noted that the statute had another core purpose, namely that all firearm transactions comply with "record-keeping provisions," so law enforcement can track firearms. *Id.* The Court recognized that by avoiding the record-keeping requirements, "many would-be criminals [who]

1 remain legally eligible to buy firearms . . . could use [straw purchasers] to purchase
2 an endless stream of guns off-the-books." *Id.*

3     In the instant case, the facts constituting Count Three are that Mr.
4 Gourdikian went to an FFL, purchased the listed firearm, and completed Form
5 4473, stating that he was purchasing the firearm for himself. While waiting for the
6 firearm to be released (during the waiting period), Mr. Gourdikian offered the
7 firearm for sale on a popular firearm website. The allegation is not specifically that
8 the form was initially incorrect. However, when Mr. Gourdikian picked up the
9 firearm, he re-certified the federal form, meaning that he affirmed his earlier
10 statement that he was purchasing the firearm for himself, when, in fact, he had
11 decided to sell the firearm to another party. This unquestionably constitutes a
12 violation of the statute.

13     However, in considering the seriousness of the way in which Mr. Gourdikian
14 committed this offense, it is relevant to note that Mr. Gourdikian did not directly
15 give the firearm to the actual purchaser. Instead, when Mr. Gourdikian
16 subsequently sold the firearm to another person (the actual purchaser), that firearm
17 transaction went through an FFL and all record keeping requirements were met,
18 including the background check, and applicable waiting period. Indeed, when the
19 *Abramski* Court was considering various possible factual situations for a violation
20 of § 922(a)(6), the Court stated that in all of the scenarios, something a "true buyer
21 [the person receiving the firearm] would *not* do" is "give his identifying
22 information to the dealer and submit himself to a background check." *Abramski*,
23 573 U.S. at 180–81 (emphasis in original). Yet, that is, in fact, what happened
24 here; the actual purchaser was not a prohibited person and did give all relevant
25 identifying information to the dealer. Thus, the conduct in the instant case, while
26 undoubtedly a crime, is outside the heartland of a typical offense where a straw
27 purchaser gives a firearm directly to the ultimate possessor (whether or not
28 prohibited), without complying with the government's requirements and ensuring

the requisite record-keeping.

## B. SECTION 3553(A) FACTORS CONCERNING THE NEED FOR THE SENTENCE IMPOSED

The next factors under section 3553(a) concern the need for a particular sentence. The mandatory principle of section 3553 is a limiting one, the sentence must be *"sufficient, but not greater than necessary,"* to satisfy the need for the sentence imposed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2) (emphasis added).

Courts across the country have recognized that they must honor this parsimonious provision. *See, e.g.,* Carty, 520 F.3d at 991; *United States v. Spigner*, 416 F.3d 708, 711 (8th Cir. 2005).

### 1. THE SERIOUSNESS OF THE OFFENSE

Mr. Gourdikian understands and realizes the seriousness of his offense and is deeply ashamed of his actions. As his many friends and family attest, Mr. Gourdikian's remorse is genuine, and felt deeply. As his friend, Art Chute, writes: "After speaking with Vasken on several occasions, I'm well aware of the regret and shame he feels for embarrassing not only himself but his family, friends, police department and coworkers." (Exhibit U, Letter from Art Chute.) Mr. Gourdikian has lost the job he loves and tarnished his decades-long career on the police force, which will serve as a reminder of his mistake for the rest of his life. (See Exhibit V, Letter from Greg Afsharian.)

In sum, Mr. Gourdikian understands the severity of his mistakes and will not reoffend.

## 2.   THE NEED TO PROVIDE JUST PUNISHMENT AND PROMOTE RESPECT FOR THE LAW

18 U.S.C. § 3553 mandates that the court consider the need for the sentence imposed to provide just punishment for the offense. 18 U.S.C. § 3553(a)(2)(A). In order to determine whether a punishment is "just," a number of factors need to be considered. A "just" punishment is punishment that "fits the crime." *Simon v. United States*, 361 F. Supp. 2d 35, 43 (E.D.N.Y. 2005). The punishment should not be unreasonably harsh under all of the circumstances of the case. *See United States v. Wilson*, 350 F. Supp. 2d 910 (D. Utah 2005) (citing S. Rep. No. 98-225, at 75-76 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3258-59.)

Mr. Gourdikian has already suffered enormously as a result of this conviction. Mr. Gourdikian has already lost the career that meant everything to him and hundreds of thousands of dollars in pension benefits—those collateral consequences are far worse than any sentence imposed by this Court. As Alan Snitzer explains:

> [N]o benefit will come of incarcerating this man, who has lost virtually everything as a result of his admitted violations of law and poor judgment[sic], but who worked very hard to protect the public for nearly 2 ½ decades – placing his life on the line every day he went to work – and who has already lost a well-paying career with what might have been a very bright future, as well as tens of thousands of dollars of forfeited personal property, i.e., the firearms.

(Exhibit D.) Accordingly, a probationary sentence is appropriate in the instant case.

## 3.   THE NEED TO PROTECT THE PUBLIC

Another factor to consider in determining the need for the sentence imposed is whether or to what extent society needs to be protected from the defendant. Mr. Gourdikian poses no risk to the community because the instant offense is truly an aberration—Mr. Gourdikian has no criminal history, and in his decades-long career

as a police officer never had any other complaints or issues. Additionally, because of his felony conviction, Mr. Gourdikian will never again be able to purchase a firearm, and he will never again be allowed to conduct a firearm transfer.

Furthermore, Mr. Gourdikian has demonstrated to this Court that he can be compliant with court-ordered supervision. Mr. Gourdikian was arrested for the instant offense almost two years ago. Since his release on bond in March 2018, Mr. Gourdikian has remained in strict compliance with the terms of his pre-trial release.

Accordingly, given his long history of charitable and civic engagement, Mr. Gourdikian can be of better serve his community outside of prison.

## 4.   THERE IS A LOW LIKELIHOOD OF RECIDIVISM

In determining whether the length of the sentence is adequate to protect the general public from further crimes of the defendant, it is also relevant to determine a defendant's likelihood of recidivism.

Mr. Gourdikian is forty-eight years old. Given his age, lack of criminal history, and the significant stress and shame his actions have brought on his family as a result of this case, it is extremely unlikely that Mr. Gourdikian would recidivate. As Mr. Gourdikian's friend, Todd McDonald, writes:

> From the beginning, Vasken expressed great remorse for his actions. He showed genuine regret not merely for the criminal liability he faced, but for those he let down. . . . I truly believe his wrongful actions represent an aberration that he will never repeat. He has demonstrated honesty, integrity, and fairness in more than 15 years that I have worked with Vasken.

(Exhibit W, Letter from Todd McDonald.) This criminal incident has brought significant pain to Mr. Gourdikian, who is deeply ashamed of the embarrassment he has caused to his family and the police department. He will not reoffend.

/ / /

/ / /

27

## C.   KINDS OF SENTENCES AVAILABLE

18 U.S.C. § 3553(a) requires consideration of the "kinds of sentences available." Thus, this Court should consider whether a term of imprisonment is necessary in the instant case. This Court has at its disposal every sentencing option in framing a just sentence for Mr. Gourdikian, including probation with some form of restriction on Mr. Gourdikian's liberty, and/or a period of home detention or halfway house.

Although custody time is permissible in the instant case, it is relevant to note that in enacting the Sentencing Reform Act of 1984 ("SRA"), Congress intended that "prison resources [would be], first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and nonserious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service." *See* Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (codified at 18 U.S.C. § 3551).[11] Thus, in determining what type of sentence is available, this Court can consider that Congress was disinclined to devote resources to nonviolent, nonserious offenders like Mr. Gourdikian.

Additionally, even if this Court declines to grant a variance for the reasons set forth above, under Section 3553(a), the "kinds of sentences" available include

---

[11] Despite the statutory goals of Congress, Guideline sentences have resulted in a larger prison population. As of year-end 2006, the Bureau of Prisons was 37% over capacity. William J. Sabol et al., Prisoners in 2006, Bureau of Justice Statistics Bulletin, Dec. 2007, at 5-6, Available at https://www.bjs.gov/content/pub/pdf/p06.pdf.; *see also Prisons, Jails & Probation*, DrugWarFacts.org, http://www.drugwarfacts.org/cms/prisons_and_jails #sthash.9v336PGw.dpuf ("The Federal Bureau of Prisons operated at 36% above reported capacity at year end 2010.").

1  the use of probation. 18 U.S.C. § 3553(a)(3).[12] This finding was reinforced in *Gall,*

2  52 U.S. 38, where the Supreme Court recognized the value of a probationary

3  sentence under the SRA and Section 3553(a), even when probation is not called for

4  by the total offense level. *Id.* at 44. In *Gall,* the Supreme Court admonished

5  sentencing courts to "'consider every convicted person as an individual,'"

6  remaining mindful that a sentence of imprisonment "may work to promote not

7  respect, but derision, for the law if the law is viewed as merely a means to dispense

8  harsh punishment without taking into account the real conduct and circumstances

9  involved in sentencing." *Id.* at 52, 54 (citations omitted). The *Gall* Court also noted

10  that "'Probation is not granted out of a spirit of leniency.'" *Id.* at 48 n.4 (quoting

11  Guides for Sentencing, Advisory Council of Judges of National Council on Crime

12  and Delinquency at 13-14 (1957)). Indeed, "[o]ffenders on probation are . . .

13  subject to several standard conditions that substantially restrict their liberty." *Id.* at

14  48 (citing *United States v. Knights,* 534 U.S. 112, 119 (2001) This can include

15  individualized specific conditions to address the issues attendant to a particular

16  case. *Id.* at 48.

17      As a result, regardless of the Guideline calculation, this Court should

18  consider whether, based on the unique facts of the instant case, a term of probation,

19  or other non-custodial sentence, is available. The instant case is one where the

20  "type of sentence" imposed need not be imprisonment. A period of probation, with

21  serious conditions, or a term of house arrest, can adequately meet the goals of

22  § 3553.

23  / / /

24

25

---

26  [12] 18 U.S.C. § 3582(a) provides that "[t]he court, in determining whether to impose
    a term of imprisonment, and, if a term of imprisonment is to be imposed, in
27  determining the length of the term, shall consider the factors set forth in section
    3553(a) to the extent that they are applicable[.]"
28

29

# IV.
## CONCLUSION

In sum, the Court should consider whether, based on the unique facts of the instant case, a term of probation is appropriate. The instant case is one where a period of supervised release, with serious conditions can adequately meet the goals of § 3553. For the reasons set forth above, Mr. Gourdikian requests that this Court fashion a probationary sentence that serves the ends of justice.

DATED: January 18, 2019

Respectfully submitted,
WERKSMAN JACKSON & QUINN LLP

Mark J. Werksman
Kelly C. Quinn
Elizabeth S. Little
Attorneys for Defendant