Mark J. Werksman, Esq. (State Bar No. 120767)
Kelly C. Quinn, Esq. (State Bar No. 197697)
Elizabeth Little, Esq. (State Bar No. 307944)
WERKSMAN JACKSON & QUINN LLP
888 West Sixth Street, Fourth Floor
Los Angeles, California 90017
Telephone: (213) 688-0460
Facsimile: (213) 624-1942
Email: mwerksman@werksmanjackson.com

Attorneys for Defendant
Vasken Kenneth Gourdikian

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 18-104-SVW |
| Plaintiff, | **DEFENDANT VASKEN KENNETH GOURDIKIAN'S REPLY TO GOVERNMENT'S SENTENCING RESPONSE** |
| v. | |
| VASKEN KENNETH GOURDIKIAN, | |
| Defendant. | |

# TABLE OF CONTENTS

**PAGE(S)**

I. ARGUMENT .................................................................................................. 3

    A. THE GOVERNMENT REPEATEDLY CONFUSES THE PRE-*BOOKER* STANDARD FOR A DEPARTURE WITH THE LAW GOVERNING VARIANCES UNDER 18 U.S.C. § 3553(a) .............. 3

        1. A CONSIDERATION OF DEFENDANT'S EDUCATION, CAREER, CHARITABLE WORKS, CIVIC ENGAGEMENT, AND LOW RISK OF RECIDIVISM SUPPORTS THE IMPOSITION OF A NON-CUSTODIAL SENTENCE ......................................... 3

        2. THE FACT THAT MR. GOURDIKIAN IS UNLIKELY TO RECIDIVATE SUPPORTS A DOWNWARD VARIANCE UNDER 18 U.S.C. § 3553(a)(2)(C) ..................... 7

        3. CONSIDERATION OF THE IMPACT OF INCARCERATION ON DEFENDANT'S FAMILY WARRANTS THE IMPOSITION OF A SENTENCE THAT INCLUDES A CUSTODIAL TERM OF 30 MONTHS ........................................................................... 8

    B. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE DO NOT WARRANT A CUSTODIAL SENTENCE OF 30 MONTHS ................................................................................................. 9

        1. THE INDIVIDUAL FIREMARM TRANSACTIONS WERE OTHERWISE LAWFUL ....................................................... 10

        2. PRIVATE PARTY TRANSACTIONS ARE NOT UNREGULATED IN CALIFORNIA ..................................... 10

        3. THE ABUSE OF TRUST IN THE INSTANT CASE ............. 11

        4. *MCGOWAN* IS NOT ANALOGOUS TO THE INSTANT CASE ................................................................................ 11

II. CONCLUSION .......................................................................................... 15

# TABLE OF AUTHORITIES

**PAGE(S)**

**SUPREME COURT CASES**

*Gall v. United States*
    552 U.S. ...................................................................................... *passim*

*Kimbrough v. United States*
    552 U.S. 85 ................................................................................. 3,8

*Koon v. United States*
    6 U.S. 81 ..................................................................................... 7

*Thurston v. United States*
    543 U.S. 1097 ............................................................................ 4,5

*United States v. Booker*
    543 U.S. 220 ............................................................................... 4

**FEDERAL CASES**

*United States v. Anderson*
    603 Fed.Appx. 365 ...................................................................... 6

*United States v. Carper*
    659 F.3d 923 ............................................................................... 8

*United States v. Cox*
    796 F.Supp.2d 221 ...................................................................... 8

*United States v. McGowan*
    No. 12-207 (C.A. E.D. 2016) ................................................... 12,13

*United States v. Morken*
    133 F.3d 628 ............................................................................. 4,5

*United States v. Schroeder*
    563 F.3d 746 ............................................................................... 8

*United States v. Thurston*
    358 F.3d 51 ................................................................................. 4

*United States v. Tomko*
    582 F.3d 558 ............................................................................... 5

*United States v. Working*
    287 F.3d 801 ............................................................................... 7

**FEDERAL STATUTES**

18 U.S.C. § 922 (a) (1) (A) ................................................................. 9

18 U.S.C. § 3553 ................................................................... *passim*

Mark J. Werksman, Esq. (State Bar No. 120767)
Kelly C. Quinn, Esq. (State Bar No. 197697)
Elizabeth Little, Esq. (State Bar No. 307944)
WERKSMAN JACKSON & QUINN LLP
888 West Sixth Street, Fourth Floor
Los Angeles, California 90017
Telephone: (213) 688-0460
Facsimile: (213) 624-1942
Email: mwerksman@werksmanjackson.com

Attorneys for Defendant
Vasken Kenneth Gourdikian

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 18-104-SVW |
| Plaintiff, | **DEFENDANT VASKEN KENNETH GOURDIKIAN'S REPLY TO GOVERNMENT'S SENTENCING RESPONSE** |
| v. | |
| VASKEN KENNETH GOURDIKIAN, | |
| Defendant. | |

**TO THE HONORABLE STEPHEN V. WILSON, UNITED STATES DISTRICT JUDGE, AND TO ASSISTANT UNTED STATES ATTORNEY ELIZA FERNANDEZ:**

Defendant, Vasken Kenneth Gourdikian, by and through his counsel of record, WERKSMAN JACKSON & QUINN LLP, hereby files Defendant Vasken Kenneth Gourdikian's Reply to Government's Sentencing Response.

///
///
///
///

1

| | |
|---|---|
| DATED: February 5, 2019 | Respectfully submitted,<br>WERKSMAN JACKSON & QUINN LLP<br><br>*/s/ Mark J. Werksman*<br>Mark J. Werksman<br>Kelly C. Quinn<br>Elizabeth Little<br>Attorneys for Defendant<br>Vasken Kenneth Gourdikian |

# I.
# ARGUMENT

On January 8, 2019, Mr. Gourdikian filed Defendant Gourdikian's Sentencing Memorandum. On January 20, 2019, the government filed its Sentencing Position. On January 29, 2019, the government filed a Sentencing Response, raising arguments not included in its Sentencing Memorandum. Mr. Gourdikian replies to the government's Response as set forth herein.

### A. THE GOVERNMENT REPEATEDLY CONFUSES THE PRE-*BOOKER* STANDARD FOR A DEPARTURE WITH THE LAW GOVERNING VARIANCES UNDER 18 U.S.C. § 3553(a)

In Defendant's Sentencing Memorandum, Mr. Gourdikian argues that the 18 U.S.C. § 3553(a) factors, considered together, warrant a sentence substantially less than the thirty months recommended by Probation. (Doc. 33, 11-29.) In its Sentencing Response, the government repeatedly misstates the standard governing variances under 18 U.S.C. § 3553(a), and improperly applies the pre-*Booker* heightened standard for a departure under the guidelines. As set forth in *Gall v. United States*, 552 U.S. 38, 47 (2007), a court does not need to find "extraordinary circumstances" to find that a variance is warranted under one of the § 3553(a) factors. Thus, the Court should properly consider Mr. Gourdikian's education, career, charitable works, low risk of recidivism, and the impact of incarceration on his family members under the standard applicable to variances as set forth in 18 U.S.C. § 3553(a).

### 1. A CONSIDERATION OF DEFENDANT'S EDUCATION, CAREER, CHARITABLE WORKS, CIVIC ENGAGEMENT, AND LOW RISK OF RECIDIVISM SUPPORTS THE IMPOSITION OF A NON-CUSTODIAL SENTENCE

In its Sentencing Response, the government argues that defendant's extensive civic engagement might have earned him respect in his community, but "does not support a variance/departure." (Doc. 35 at 12.) In support of its

contention that Mr. Gourdikian's decades of charitable contributions and service to the community should be ignored *in toto*, the government argues that his profession required community engagement, that he used at least one charity-fundraising related account to co-mingle funds for his business (a statement that is completely unfounded, prejudicial, and misleading), and that personal volunteerism is common among professional defendants." (Doc. 35 at 12.) The government's assertions lack basis in fact and fly in the face of the Court's required consideration of the "history and characteristics" of the defendant in reaching an appropriate sentence under 18 U.S.C. § 3553(a).

In support of its claim that Mr. Gourdikian should receive no variances or departures on the basis of his "extensive" civic engagement, the government cites U.S.S.G. § 5H1.11, which states that "[c]ivic, charitable or public service, employment-related contributions, and similar prior good works are not ordinarily relevant in determining whether a departure is warranted." U.S.S.G. § 5H1.11. However, Mr. Gourdikian is not requesting a departure from the guidelines; he is asking for a downward variance based on the factors set forth in 18 U.S.C. § 3553(a) (i.e. the history and characteristics of the defendant). The government confuses the distinction between a departure and a post-*Booker* variance in its reliance on *United States v. Thurston*, 358 F.3d 51, 78 (1st Cir. 2004), vacated by *Thurston v. United States* (2005) 543 U.S. 1097, and *United States v. Morken*, 133 F.3d 628, 629 (8th Cir. 1996).

To illustrate, the government correctly states that *Thurston* reversed a downward departure for civic engagement, finding that it was not "exceptional", under solely a guideline departure analysis. However, that decision was vacated on petition for writ of certiorari and the case was remanded to the First Circuit for consideration in light of *United States v. Booker*, 543 U.S. 220 (2005) and *Gall v.*

4

*United States*, 552 U.S. 38 (2007), to determine whether there was sufficient evidence to warrant a variance under § 3553(a).[1] *Thurston v. United States*, 543 U.S. 1097 (2006); *Thurston v. United States*, 543 U.S. 1097 (2005). Ultimately, when back on appeal, the Court affirmed the district court's conclusion that Thurston's sentence served the goal of specific deterrence, that he accepted responsibility for his crime, and that defendant's "'charitable work, community service, generosity with time, and spiritual support and assistance to others'" justified the significant variance under this new, "totality of the circumstances" test. *United States v. Thurston*, 544 F.3d 22, 26 (2008).

The government also relies on *United States v. Morken, supra*, 133 F.3d 628. *Morken* is also a pre-*Booker* case in which the Eighth Circuit rejected a *departure* under the guidelines on the basis that being a good neighbor and friend and serving on a church council did not constitute "exceptional" good works under U.S.S.G. § 5H1.11. Again, Mr. Gourdikian is not requesting a departure under the guidelines; and thus, is not required to prove that his works were "exceptional" to justify a downward variance. To be clear, post-*Booker*, "exceptional" or "extraordinary" circumstances are not necessary to justify a substantial variance from the guideline range. *Gall v. United States, supra*, 552 U.S. 38, 47. Instead, Post-*Booker*, charitable works may justify a variance as part of the consideration of the overall

---

[1] On remand, the First Circuit found that, "[u]nder this more flexible approach, Thurston's good works could justify a somewhat shorter sentence," but ultimately found the departure unreasonable. *United States v. Thurston*, 456 F.3d 211, 220 (2006), vacated by *Thurston v. United States*, 552 U.S. 1092 (2008). That case was *again* vacated and remanded for further consideration in light of the United States Supreme Court's decision in *Gall v. United States*, 552 U.S. 38 (2007). Significantly, under a post-*Gall* analysis, the First Circuit found that the district court relied on a host of § 3553(a) factors in reducing his sentence from the guideline range of 63 to 78 months to three months' incarceration followed by 24 months supervised release and affirmed his sentence. *United States v. Thurston*, 544 F.3d 22, 23-24, 26.

history and characteristics of the defendant. *See, e.g., United States v. Tomko*, 582 F.3d 558 (3d Cir. 2009) (affirming twelve-month variance on the basis of, *inter alia*, community ties and extensive charitable works); *United States v. Anderson*, 603 Fed.Appx. 365, 367 (6th Cir. 2015) (affirming two-level downward variance based on clean criminal record, earlier good works, and the fact that the government received benefit from her work). As set forth in Defendant's Sentencing Memorandum, Mr. Gourdikian's commitment to service and civic engagement is exceptional and warrants a significant downward variance.

Notwithstanding the government's misstatement of the law concerning variances, the government further alleges that "defendant at times used his charity work to further his illegal firearms conduct" and that he "co-mingled fundraising/donations with the proceeds of his firearms sale and utilized the account to purchase firearms." (Doc. 35 at 17-18.) The government's allegations are contravened by the Department of Justice's own report, which specifically found: "It has . . . not been established if GOURDIKIAN profited from the events or used event proceeds to purchase firearms in further of dealing in firearms without a license." (Doc. 35-8 at 7.) Mr. Gourdikian vehemently denies these inflammatory and false allegations. To be clear, Blue Smoke is an informal group of retired police officers who get together two or three times per year to smoke cigars and share a meal—no dues were ever collected, no membership fees were ever required, and all hosted dinners were always at-cost and not-for-profit. (See Exhibit A, Decl. of Vasken Gourdikian, ¶¶2-3.)

The government references a single event hosted by Blue Smoke in 2012, which was meant to benefit the Pasadena Police Activities League and the Officer Andrew Garton Memorial Fund. That event occurred years before Mr. Gourdikian ever used the account to purchase a firearm. (Exhibit A, ¶4.) All proceeds from that

fundraiser were paid out long before he began using that account to purchase firearms in 2014. (Exhibit A, ¶4.) Mr. Gourdikian never comingled fundraising and donation efforts with the proceeds of his firearms sales. (Exhibit A, ¶5.) Any money that entered the account for hosted dinners among friends between 2014 and 2017 was used exclusively for those dinners. (Exhibit A, ¶6.) Those monies were not used to fund Mr. Gourdikian's firearms purchases. (Exhibit A, ¶6.)

Additionally, the numerous support letters submitted on his behalf clearly demonstrate that Mr. Gourdikian's engagement in the community far surpassed any volunteer work that might be attendant to his position as a peace officer. Accordingly, Mr. Gourdikian's service to his community and significant civic engagement warrant a substantial variance.

### 2. THE FACT THAT MR. GOURDIKIAN IS UNLIKELY TO RECIDIVATE SUPPORTS A DOWNWARD VARIANCE UNDER 18 U.S.C. § 3553(a)(2)(C)

Under 18 U.S.C. § 3553(a)(2)(C), courts are required to consider the need for the sentence imposed "to protect the public from further crimes of the defendant." *Id.* Thus, courts are necessarily required to consider the likelihood of recidivism in reaching an appropriate sentence. In its response, the government asserts that "[t]he Ninth Circuit has rejected defendant's assertion that a low-risk of recidivism can form the basis [for] departure. See *United States v. Working*, 287 F.3d 801, 808 (9th Cir. 2002) (citing *Koon v. United States*, 516 U.S. 81 (S.Ct. 1996)." (Doc 35 at 14.) The government again confuses the issue—Mr. Gourdikian is seeking a variance under 18 U.S.C. § 3553(a)(2)(C), not a departure under the Guidelines. The cases cited by the government, *United States v. Working, supra*, F.3d at 808 and *Koon v. United States, supra*, 518 U.S. at 83-84, are pre-*Booker* cases, which hold that recidivism is an inappropriate ground for a departure because the Commission specifically addressed that factor in formulating the sentencing range for petitioner's criminal history category. *Id.* However, the Ninth

Circuit has subsequently held that a variance based on a low likelihood of recidivism under 18 U.S.C. § 3553(a)(2)(C) is appropriate. See, e.g., *United States v. Carper*, 659 F.3d 923, 924-925 (9th Cir. 2011) (affirming downward variance because of defendant's military service and because there was little to no likelihood of recidivism).

### 3. CONSIDERATION OF THE IMPACT OF INCARCERATION ON DEFENDANT'S FAMILY WARRANTS THE IMPOSITION OF A SENTENCE THAT INCLUDES A CUSTODIAL TERM OF 30 MONTHS

The government argues that a district court may only impose a below-guidelines sentence when the impact of incarceration on defendant's family is so unusual that it may be characterized as "extraordinary." (Doc. 35 at 15 (citing U.S.S.G. § 5H1.6).) The government again confuses the issue. In considering Mr. Gourdikian's history and characteristics, a relevant consideration is the impact incarceration would have on family members. See *United States v. Schroeder*, 563 F.3d 746, 756 (7th Cir. 2008). Again, because family circumstances are now relevant under U.S.S.G. § 3553(a), a defendant need not meet the stringent requirements for a departure under § 5H1.6, which requires that the family circumstances be "extraordinary." See *Kimbrough v. United States*, *supra*, 552 U.S. at 562-563, citing *Gall v. United States*, *supra*, 552 U.S. at 51-52; *United States v. Cox*, 796 F.Supp.2d 221, 224 (D. Maine 2011). Thus, this Court can consider the impact that Mr. Gourdikian's incarceration would have on innocent family members, regardless of whether that impact would be considered "extraordinary." *Id.*

### B. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE DO NOT WARRANT A CUSTODIAL SENTENCE OF 30 MONTHS

Mr. Gourdikian has pleaded guilty to Engaging in the Business of Dealing in Firearms without a License, in violation of 18 U.S.C. § 922(a)(1)(A) (Count One); and Making a False Statement During the Purchase of Firearm, in violation of 18

U.S.C. § 922(a)(6) (Count Three). Mr. Gourdikian does not dispute the facts from the Plea Agreement which show that he was required to have a federal firearms license ("FFL"), or that he made the false statement. Mr. Gourdikian's Sentencing Memorandum, however, sought to clarify the complex interplay of state and federal firearms laws relevant to the individual firearm transactions described in the instant case, by showing that those individual transactions were otherwise lawful. (Doc. 33, at 14–23.) As to Count One, the illegality of Mr. Gourdikian's actions lies in the *quantity* of transactions, which required Mr. Gourdikian to obtain a firearms license, not the transactions themselves.

Although Mr. Gourdikian complied with both state and federal law during each individual transaction, in its new pleading, the government describes these lawful transactions in a manner calculated to make them appear nefarious. For example, the government makes much of, *inter alia*, the fact that 1) payment was accepted "directly from the purchasers," 2) that "[t]he private gun market . . . has long been recognized as a leading source of guns used in crimes;" and 3) that these were off-Roster sales. (Doc. 35, at 2–8.) Yet, as set forth below, the government's characterization of these transactions is disingenuous.

1. **THE INDIVIDUAL FIREARM TRANSACTIONS WERE OTHERWISE LAWFUL**

In its first argument, the government focuses on the fact that, during the undercover sale, Mr. Gourdikian "acknowledge[d]" that money passed from the buyer, the undercover agent, to the seller, Mr. Gourdikian.[2] (Doc. 35, at 2.) The government has repeated this fact—that Mr. Gourdikian "directly" received money

---

[2] As noted in the Sentencing Memorandum, this transaction went through every proper procedure: all of the required federal and state forms were filled out, the buyer obtained a firearm safety card, the buyer filed out information for a background check, and the firearm remained at the FFL for the requisite waiting period. (Doc. 33, at 18, fn. 7.)

9

for firearms—as if it were somehow evidence of a dirty deal. Such an assertion simply misunderstands the process of private-party transactions in California. Under California regulations, the FFL takes its money as payment for its services, and also collects any applicable fees. Separately, there is an exchange of money for the firearm itself. As with most sales transactions, money is exchanged from the party buying the item to the party selling the item. This is quite literally the only way that private party transactions can occur. Thus, the fact that, while abiding by all state and federal reporting requirements, Mr. Gourdikian received payment for a good he was selling, is not somehow evidence of criminal or nefarious activity.

### 2. PRIVATE PARTY TRANSACTIONS ARE NOT UNREGULATED IN CALIFORNIA

Next, the government laments the fact that the firearms in the instant case were exchanged via private-party transactions. (Doc. 35, at 2–3.) The government notes the well-documented problems with private party transactions, namely that because these transactions are typically unregulated, they are a haven for criminals. (Doc. 35, at 2–3, noting Doc. 33, at 17, fn. 5, citing Garen J. Wintemute, Anthony A. Braga, & David M. Kennedy, *Private–party Gun Sales, Regulation, and Public Safety*, 6 New England Journal of Medicine 363, 508–511 (2010).) The article cited in the government's new filing discusses the well noted concerns with this process, and sets forth that private-party transactions are troublesome because "there are two systems of retail gun commerce in this country, one involving licensed gun retailers and the other based on private-party gun sellers, and only the former of these systems is regulated." *See* Garen J. Wintemute, Anthony A. Braga, & David M. Kennedy, *Private–party Gun Sales, Regulation, and Public Safety*, 6 New England Journal of Medicine 363, 508–511 (2010). In the Sentencing Memorandum, Mr. Gourdikian specifically relayed this often-repeated concern about private-party transactions to show that, although the transactions at issue

here were private-party transactions, this type of transaction in California is actually subject to *more regulation* than purchases made through an FFL. Thus, because of the particular contours of California firearms law, the typical concerns associated with private-party transactions, and discussed in the above-referenced article, are not at issue in the instant case.

### 3. THE ABUSE OF TRUST IN THE INSTANT CASE

Mr. Gourdikian has repeatedly acknowledged that, as a peace officer, he had certain advantages in the buying and selling of firearms that the average citizen does not. As such, Mr. Gourdikian agreed to a two-level increase for abuse of a position of public trust. However, the government mischaracterizes the advantages available to Mr. Gourdikian, especially as they relate to the purchase and sell of off-Roster firearms and the number of firearms an individual can purchase. (Doc. 35, at 6–7.)

In the Sentencing Memorandum, Mr. Gourdikian discusses the purchase and sale of off-Roster firearms in California. (Doc. 33, at 19.) In giving examples of how these firearms could be purchased and sold, Mr. Gourdikian did not set forth an exhaustive analysis of state law concerning off-Roster firearms because California firearms law is complex and extensive. However, to further clarify any confusion: 1) these firearms are lawful for anyone to possess in California; 2) only persons listed in the statute (law enforcement, prosecutors, etc. can purchase these firearms *directly* from an FFL; and 3) *everyone in California* can *buy or sell* these firearms through a private party transfer (using an FFL). Cal. Pen. Code, § 32110. Therefore, *every person* able to legally possess firearms in California can buy and sell these firearms. Mr. Gourdikian's status as a law enforcement officer did not give him the unique ability to *lawfully purchase or sell* off-Roster firearms through private party transactions. Instead, the singular advantage is that those persons

listed in the statute can additionally lawfully purchase these firearms *directly* from an FFL.

Additionally, the government asserts that Mr. Gourdikian exploited his police officer status to avoid California's limitation of one handgun per month. Certainly, peace officers in California have an advantage because they are not limited by the "one handgun every 30 days" requirement. Cal. Pen. Code, § 27535. However, as noted throughout the PSR, most of these transactions at issue were effectuated by private party transactions. To be clear, while California law has a number limitation when a firearm is purchased by a non-enumerated person directly from an FFL, *all private party* transactions are exempt from the "one handgun per month" limitation. Cal. Pen. Code §27535(b). The private party transaction exemption is not dependent on a person's status as a law enforcement officer. Thus, any transactions Mr. Gourdikian made through a private party transfer were not dependent on his status as a police officer.

4. *MCGOWAN* IS NOT ANALOGOUS TO THE INSTANT CASE

In its new filing, the government cites to *United States v. McGowan* as analogous to the instant case. (Doc. 35, at 4; *United States v. McGowan*, No. 12-207 (C.A. E.D. 2016).) In *McGowan*, the defendant, a peace officer who purchased over forty firearms and sold twenty-seven, received an 18-month sentence. The government argues that because Mr. Gourdikian sold more firearms, he should receive a higher sentence. *Id*. However, the appellate document filed by the government in *McGowan* shows that, in addition to the number of firearms sold without a license, the defendant assembled a high-capacity 25-round magazine (unlawful to transfer under California law), he then sold the unlawful magazine to an undercover agent, and specifically told the undercover agent that the sale was unlawful and instructed the agent "to stick [the magazine] in [his] car right now" to avoid detection. Answering Brief of the United States at 10, *United States v.*

*McGowan*, No. 16-10300 (9th Cir. July 7, 2017). McGowan additionally sold a .50 caliber firearm, and he engaged in what the government deemed a conspiracy with other defendants to unlawfully transfer off-Roster firearms.[3] *Id.* at 65. Furthermore, according to the government's briefing in that case "[d]uring the transaction (with the undercover agent), McGowan clearly and accurately explained to the undercover agent that it is a violation of federal law to engage in the business of selling firearms," yet he did so anyway. *Id.* at 11. The defendant also lied to the police and was not cooperative during the investigation. *Id.*

Despite the many dissimilarities between the two cases, the government attempts to argue that Mr. Gourdikian's actions were more egregious. The government asserts that Mr. Gourdikian similarly knew that he needed an FFL and, like *McGowan*, specifically chose to violate the law by failing to obtain one. However, that assertion is unfounded. Mr. Gourdikian, who was fully cooperative with agents, repeatedly stated that he believed that he did not need a federal license because he was a collector. Regardless, the government attempts to show that Mr. Gourdikian knowingly violated the law by citing to a discussion from Calguns.net wherein Mr. Gourdikian and another law enforcement officer discussed California firearms law. (Doc. 35, at 6.) The cited portions do not support the government's assertion that Mr. Gourdikian knew he needed a federal license. Instead, they show that the two officers noted that California is a "strange market" for firearm transactions, because, *inter alia*, it is lawful for law enforcement officers to purchase and sell off-Roster firearms. (Doc. 35, at 6.) User A discussed concerns

---

[3] The government alleged that McGowan conspired with one of the co-defendants (an FFL) to purchase off-roster firearms from the co-defendant FFL and transfer those firearms back to the FFL co-defendant in a private party transaction; and then have the FFL do a private party transaction to a third party. Answering Brief of the United States at 10, *United States v. McGowan*, No. 16-10300 (9th Cir. July 7, 2017). There was no such conspiracy alleged in the instant case.

13

that departments were having about officers using law enforcement exemptions to obtain firearms and "letterhead" going missing (and presumably being used to certify that a firearm is for active duty, thereby avoiding the waiting period, etc.). There was no discussion about federal licensing law or the desire to run afoul of it. On the contrary, User A affirmatively stated that all transfers, "will have to go through an FFL dealer and be above board." *Id*. Despite the plain language of these two officers accurately discussing California's extremely complex firearms law, the government inexplicably seeks to characterize this discussion as an "exchange of messages demonstrat[ing] defendant['s] knowing and intentional disregard of firearms laws, rather than a mere error or oversight," asserting that the "intentional conduct" of simply knowing federal licensing regulations warrants a custody sentence. (Doc. 35, at 6.) That assertion is simply not supported by the evidence.

## II. CONCLUSION

For the foregoing reasons, Mr. Gourdikian submits that the factors set forth in 18 U.S.C. § 3553(a), suggest that a non-custodial sentence is appropriate in this case.

DATED: February 5, 2019

Respectfully submitted,
WERKSMAN JACKSON & QUINN LLP

Mark J. Werksman
Kelly C. Quinn
Attorneys for Defendant

14